**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MUNICIPALITY OF PRINCETON, NEW JERSEY, | |
| Plaintiff, | Civil Action No. 23-22756 (MAS) (JTQ) |
| v. | **MEMORANDUM OPINION** |
| ACE AMERICAN INSURANCE COMPANY, d/b/a CHUBB NORTH AMERICAN, | |
| Defendant. | |

**SHIPP, District Judge**

      This matter comes before the Court on the motion to dismiss ("Motion") filed by Defendant ACE American Insurance Company, d/b/a Chubb North American ("ACE") in this case brought by Plaintiff Municipality of Princeton, New Jersey ("Princeton") alleging the breach of an insurance policy. (ECF No. 8.) Princeton has opposed the Motion. (ECF No. 10.) ACE has replied. (ECF No. 11.) The Court has carefully considered the parties' submissions and decides the matter without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1. For the reasons outlined below, the Motion is granted in part and denied in part.

## I.    BACKGROUND[1]

### A.    The Policy

      ACE issued an insurance policy (the "Policy") to Princeton: (1) covering liability linked to "pollution conditions," including any related investigation and remediation, incurred from March

---

[1] The Court accepts all of Princeton's factual allegations that are set forth in the Complaint as true at this juncture. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

1, 2019 to March 1, 2020; and (2) providing $1 million per pollution condition with a $1 million policy aggregate, subject to a $25,000 self-insured retention. (Compl. 1, 3, ECF No. 1-1; Policy 1, ECF No. 1-2 (entitled "Premises Pollution Liability Insurance Policy").) The Policy provided the following:

> ### I.   INSURING AGREEMENTS
>
> Solely to the extent that the coverages below are identified on the Declarations to this Policy as being underwritten by the Insurer, the Insurer agrees to pay on behalf of the "insured" for "loss", in excess of the "self-insured retention" or deductible period (as applicable), resulting from:
>
> > A.      POLLUTION   CONDITIONS   OR   INDOOR ENVIRONMENTAL   CONDITIONS   COVERAGE (Coverage A.)
> >
> > "Claims" and "first-party claims" arising out of: 1) a "pollution condition" on, at, under or migrating from a "covered location"; or 2) an "indoor environmental condition" at a "covered location", provided the "claim" is first made, or the "insured" first discovers the "pollution condition" or "indoor environmental condition" that is the subject of such "first-party claim", during the "policy period". . . .
> >
> > . . . .
> >
> > C.      NON-OWNED   DISPOSAL   SITE   COVERAGE (Coverage C.)
> >
> > "Claims" arising out of a "pollution condition" on, at, under or migrating from a "non-owned disposal site", provided the "claim" is first made during the "policy period". . . .
> >
> > The coverage afforded pursuant to this Coverage C. only applies to "pollution conditions" that are attributable to a "named insured's" waste generated at a "covered location" and received at the "non-owned disposal site", in its entirety
> > . . . .
> >
> > . . . .
>
> ### V.   DEFINITIONS
>
> > . . . .
> >
> > K.      "Covered location" means:

2

1.      Any location specifically identified in Item 9. of the Declarations to this Policy;

2.      Any location that is specifically identified on a Schedule of Covered Locations attached to this Policy . . . .

. . . .

Y.      "Illicit abandonment" means:

1.      Solely with respect to coverage for "covered locations", the intentional placement or abandonment of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including contaminated soil, contaminated silt, contaminated sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, including "low-level radioactive waste", "mixed waste" and medical, red bag, infectious and pathological wastes, on, at or into a "covered location", by a person or entity that:

a.      Is not an "insured"; and

b.      Is not affiliated by common ownership with an "insured" . . . .

. . . .

AA.    "Insured" means the "first named insured", any "named insured", any "additional insured", and any past or present director or officer of, partner in, employee of, temporary or leased worker of, or, with respect to a limited liability company, a member of, any of the foregoing while acting within the scope of his or her duties as such.

. . . .

DD.    "Loss" means:

Coverage A.
1.      A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages";
2.      "Legal defense expense";
3.      "First-party remediation costs";
4.      "Emergency response costs";
5.      "Business interruption loss"; and
6.      "Catastrophe management costs".

3

. . . .

Coverage C.

12.     A monetary judgment, award or settlement of compensatory damages arising from "bodily injury", "property damage" or "remediation costs", including associated "extra damages" and "legal defense expense"; and

13.     "Catastrophe management costs".

. . . .

JJ.     "Non-owned disposal site" means:

1.     Any treatment, storage, transfer, disposal or recycling site or facility . . . that has not at any time been owned or operated, in whole or in part, by any "insured", which receives, or has historically received, a "named insured's" waste for disposal; provided that such treatment, storage, transfer, disposal or recycling site or facility:

     a.     Was properly permitted and licensed pursuant to "environmental law" to accept the "named insured's" waste at the time of such disposal by the Federal, state, commonwealth, municipal or other local government agencies or bodies with applicable jurisdiction;

     . . . .

     c.     Has not, prior to the time the "named insured's" waste was received for disposal, been identified on the United States EPA (CERCLA) National Priorities List or pursuant to any functional equivalent of that list made by Federal, state, commonwealth, municipal or other local government agency or body with applicable jurisdiction pursuant to "environmental law", or

2.     Any treatment, storage, transfer, disposal or recycling site or facility specifically identified on a Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

. . . .

LL.     "Pollution condition" means:

1.     "Illicit abandonment"; or

4

2.     The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

MM.   "Property damage" means:

1.     Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of use of that property;

2.     Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

3.     Diminished value of tangible property owned by a third-party; or

4.     "Natural resource damages".

"Property damage" does not mean "remediation costs".

NN.   "Remediation costs" means expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize "pollution conditions" or "indoor environmental conditions" to the extent required by "environmental law" in the jurisdiction of such "pollution conditions" or "indoor environmental conditions".

. . . .

PP.   "Responsible person" means any employee of an "insured" responsible for environmental affairs, control, or compliance at a "covered location", or any "key executive" of, officer or director of, or partner in, an "insured".

. . . .

## VI.   EXCLUSIONS

This insurance shall not apply to:

A.     Asbestos

"Loss" arising out of or related to asbestos or asbestos-containing materials.

5

This exclusion shall not apply to:

    1.    Monetary judgments, awards or settlements of compensatory damages resulting from "bodily injury" or "property damage", or any associated "extra damages" or "legal defense expenses";

    2.    Monetary judgments, awards or settlements of compensatory damages resulting from "remediation costs", or any associated "extra damages" or "legal defense expense", arising out of asbestos or asbestos-containing materials discovered in soil or groundwater; and

    3.    "First-party remediation costs", "emergency response costs", "catastrophe management costs" or "business interruption loss", or any associated "legal defense expense", resulting from "first-party claims" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater.

. . . .

F.    First-Party Property Damage

"Loss" arising out of or related to damage to real or personal property owned by, leased to, loaned to, or rented by any "insured", or otherwise in the care, custody, or control of any "insured".

This exclusion shall not apply to "first-party remediation costs", "emergency response costs", "business interruption loss" and "catastrophe management costs".

G.    Fraud or Misrepresentation

"Loss" arising out of or related to:

    1.    Fraudulent acts or material misrepresentations on the part of the "first named insured" made:

        a.    Within an Application to this Policy; or

        b.    During the Application or underwriting process prior to the inception date of this Policy,

which would have affected the Insurer's decision to either issue this Policy, or issue this Policy and its

6

endorsements pursuant to the financial terms identified in the Declarations to this Policy; or

2.       Fraudulent acts or material misrepresentations on the part of any "responsible person" during the "policy period".

. . . .

J.       Intentional Non-Compliance

"Loss" arising out of or related to the intentional disregard of, or knowing, willful, or deliberate noncompliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or any executive, judicial or administrative order, by, or at the direction of, any "responsible person".

K.       Known Conditions

"Loss" arising out of or related to "pollution conditions" or "indoor environmental conditions" in existence and reported to a "responsible person":

1.       Prior to the "policy period"; or,

2.       Solely with respect to "covered locations" added to this Policy during the period of time specifically identified in Item 2. of the Declarations to the Policy, if any, prior to the effective date of coverage for such "covered location",

and not affirmatively disclosed to the Insurer in an Application or supplemental underwriting materials provided to the Insurer to secure coverage for such "covered location" pursuant to this Policy.

. . . .

N.       Non-Owned Disposal Sites

"Loss" arising out of or related to "pollution conditions" on, at, under or migrating from any treatment, storage, disposal, transfer or recycling site or facility that is not a "non-owned disposal site".

(Policy 1, 2, 8-13.)

The Policy also included an endorsement amending the Exclusions section to add the following exclusion:

> **Landfills or Recycling Facilities**
>
> "Loss" arising out of or related to "pollution conditions" on, at or under any Landfills or Recycling Facilities that are now, or have been at any time been, leased, owned or operated by an "insured".
>
> This exclusion shall not apply to "claims" for "bodily injury" or "property damage" arising out of "pollution conditions" allegedly migrating from Landfills or Recycling Facilities that are specifically scheduled as "covered locations" pursuant to an endorsement attached to this Policy.

(Policy Amendatory Endorsement 4, ECF No. 1-2.)

The "covered locations" — referenced above as being identified in Item 9 of the Declarations to the Policy and any location that is specifically identified on a Schedule of Covered Locations attached to this Policy — are simply defined as "Locations Owned by . . . Princeton as referenced in the Statement of Values . . . list on file with [ACE]." (Policy Schedule of Covered Locations Endorsement, ECF No. 1-2.) The parties have not provided that list to the Court.

### B.    Illegal Disposal

Princeton owns a fifty-five acre parcel ("the Site") located within its borders on River Road, on which Princeton operates various public works. (Compl. 1, 7.) On June 11, 2019, the New Jersey Department of Environmental Protection ("NJDEP") discovered that construction materials had been illegally dumped on a portion of the Site. (*Id.* at 1-3.) On June 20, 2019, Princeton notified ACE of the illegal disposal and made a claim for coverage under the Policy. (*Id.* at 3; *see* 6/20/2019 Notice of Occurrence/Claim submitted by Princeton *42, *43, ECF No. 10-2.)[2] On June 26, 2019, ACE sent Princeton a reservation-of-rights letter (the "Reservation Letter"):

---

[2] Page numbers preceded by an asterisk refer to the page number on the ECF header.

(1) advising Princeton that the Policy may provide coverage related to the disposal on the Site, but that "the Policy contained exclusions which could limit or preclude coverage"; and (2) directing Princeton to (a) obtain ACE's consent before retaining environmental consultants or incurring remediation costs at the Site, (b) provide ACE with remediation plans before performing any work, and (c) obtain ACE's prior written consent to those remediation plans. (Compl. 3.)

The Reservation Letter also stated the following:

> The insured [*i.e.*, Princeton] has advised that [the] former manager of operations at the location was accepting payments from contractors in exchange for the dumping of their contracting materials at the site. It is our understanding that a criminal investigation is underway. The materials disposed of consisted of road millings, dirt, concrete, asphalt and rocks.

(Reservation Letter 1, ECF No. 8-7.) The Reservation Letter discussed the following potential issues with Princeton's coverage:

> **Pollution Conditions or Indoor Environmental Conditions Coverage.** Coverage A of the policy provides coverage for pollution conditions or indoor environmental conditions. It covers, in relevant part, claims and first party claims arising out of a pollution condition on, at, under or migrating from a covered location provided the claim is first made or the pollution condition is first discovered during the policy period. . . . The policy defines pollution condition, in relevant part, as illicit abandonment or the discharge, dispersal, release[,] escape[,] migration[,] or seepage of any solid contaminant, or pollutant. Illicit abandonment is defined in relevant part as the intentional placement or abandonment of any solid contaminant or pollutant including contaminated soil[,] silt[,] or sediment by a person that is not an insured. . . . [ACE] reserves all rights as to whether there are any pollution conditions as defined by the policy. To the extent that the facts herein fall within the policy definition of illicit abandonment, [ACE] reserves all rights to the extent that any such abandonment took place in whole or in part prior to the policy period. More information regarding the timing of the illegal dumping is needed. Lastly to the extent that there are no directives or remedial costs to be incurred coverage for this matter is not triggered. [ACE] reserves all rights as to the Insuring Agreement for Coverage A. and the policy definitions of claim, first party claim, pollution condition and illicit abandonment.

> **Potential Coverage Issues.** The policy contains exclusions that may limit or preclude coverage for this matter. The policy contains an exclusion for criminal fines and penalties . . . . The policy also precludes coverage for intentional non-compliance with any law, statutes, regulation[,] administrative [complaint], notice of violation, notice letter instruction of any governmental agency or body, or any executive, judicial or administration order by or at the direction of any responsible person. [ACE] reserves all rights in this regard. (*IV Exclusions-Intentional Non-Compliance J.*) Lastly, the policy precludes coverage for first party property damage. It does not [cover] a loss arising out of damages to real or personal property owned by, leased to, loaned to or rented to any insured or otherwise in the care, custody or control of the any insured. This exclusion does not apply to first party remediation costs. [ACE] reserves all rights in this regard. (*IV. Exclusions- F. First Party Property Damage*[.])

(*Id.* at 2.)

These portions were not set forth by Princeton in the Complaint, but the entire Reservation Letter was submitted by ACE as an exhibit in support of its Motion. (*See* Def.'s Decl. 2, ECF No. 8-2 (listing the Reservation Letter as an exhibit).) Princeton also submitted a copy of the Reservation Letter as an exhibit in support of its opposition to the pending Motion. (*See* ECF No. 10-2; *see also* Pl.'s Decl. 1, ECF No. 10-1 (asserting the aforementioned exhibit "is a true and correct copy of the June 26, 2019 [Reservation Letter] from . . . ACE").)

The NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment (the "Administrative Order") on July 24, 2019 finding that: (1) Princeton "owns and operates public works on [the Site]"; (2) the Site contained (a) "numerous piles of soils mixed with construction and demolition debris," (b) "the unapproved distribution of asphalt millings piled several feet high to support an unapproved roadway," and (c) "bags of asbestos that were generated more than six months ago"; and (3) Princeton had failed to obtain a solid-waste-facility permit from the State of New Jersey as required, and "the unpermitted dumping of solid waste on [the Site] . . . was an intentional and knowing act by representatives of Princeton." (7/24/2019 Admin.

Order 1, 2, 8, ECF No. 8-4 (submitted by ACE as an exhibit); *see also* ECF No. 10-2 (7/24/2019 Administrative Order also submitted by Princeton as an exhibit).) The NJDEP consequently directed Princeton to: (1) file a plan to remove the illegally dumped construction materials ("Clean Up Plan"); (2) remediate the Site; and (3) pay a $35,000 civil administrative penalty. (Compl. 3; 7/24/2019 Admin. Order 2, 3, 7.)

Environmental consultant TRC Companies, Inc. ("TRC") visited the Site in August 2019 and collected soil samples at ACE's request. (Compl. 4.)

In correspondence dated November 29, 2019 ("November 2019 NJDEP Correspondence"), the NJDEP: (1) directed Princeton to take certain steps to comply with the Administrative Order; and (2) set a March 29, 2020 deadline for Princeton to file the Clean Up Plan. (*Id.* at 4.)[3]

### C.     February 2020 through September 2020

On February 10, 2020, Whitman Companies, Inc. ("WCI") provided Princeton with a proposal (the "WCI Proposal") to comply with the November 2019 NJDEP Correspondence at Princeton's request. (Compl. 4.) The WCI Proposal noted that: (1) "the Site conducts some limited recycling and stages millings, municipal waste in dumpsters and houses soil arising from township projects"; (2) contractors had been allowed to store equipment at the Site; (3) there was a stockpile of construction debris, asphalt millings, gravel, and municipal waste; (4) construction debris and asphalt were mixed into soil piles; (5) an access road had been created; and (6) there was a dumpster "containing bagged asbestos pipe wrap that has been stored for an unknown amount of time." (WCI Proposal 1, ECF No. 8-6.)

---

[3] Princeton posits in its opposition brief that ACE reminded Princeton by an e-mail message on December 2, 2019 "not to incur costs for which you are seeking coverage, without [ACE's] prior written consent," and annexes the e-mail message as an exhibit in support. (Pl.'s Opp'n Br. 7, ECF No. 10; 12/2/2019 e-mail message from ACE to Princeton, ECF No. 10-2.)

On February 19, 2020, Princeton: (1) sent the WCI Proposal to ACE for review, in compliance with ACE's previous directives; and (2) requested that ACE "review and approve [the WCI Proposal] as soon as possible" due to the March 29, 2020 deadline set forth in the November 2019 NJDEP Correspondence. (Compl. 4.) On March 6, 2020, ACE "requested that Princeton send . . . [the] environmental workplans and sampling results prepared/collected by [WCI] at the Site, the anticipated duration of proposed field work at the Site, and requested that [WCI] schedule a Site visit with . . . TRC." (*Id.*)

Princeton, ACE, WCI, and TRC all participated in a conference call on May 21, 2020 to discuss WCI's Proposal. (*Id.* at 5.) A "subsequent technical call" occurred between WCI and TRC soon thereafter. (*Id.*) Based on that subsequent call, WCI changed the WCI Proposal and submitted a revised proposal to Princeton on June 16, 2020 (the "Revised WCI Proposal"). (*Id.*) On June 30, 2020, Princeton submitted the Revised WCI Proposal to ACE and requested ACE's approval so that Princeton could commence the remediation work required by the NJDEP. (*Id.*) On July 7, 2020, Princeton, ACE, WCI, and TRC all discussed the Revised WCI Proposal in a conference call, during which Princeton again requested ACE's approval. (*Id.*)

Princeton advised ACE in correspondence dated September 9, 2020 that: (1) the NJDEP had contacted Princeton; (2) the NJDEP had directed Princeton to submit and to undertake the Clean Up Plan; and (3) Princeton was now exposed to NJDEP fines and penalties "due to [ACE's] inaction and failure to approve [the Revised WCI Proposal] and requested that [ACE] provide Princeton with its final coverage position . . . and approve [the Revised WCI Proposal]." (*Id.*) Princeton then advised ACE in correspondence dated September 30, 2020 that Princeton "had failed to receive a response to . . . [the] September 9, 2020 letter requesting that [ACE] provide its

final coverage position in the matter and approve [the Revised WCI Proposal], and requested that [ACE] provide Princeton with its position by close of business on October 2, 2020." (*Id.* at 6.)

### D.     Denial of Coverage

On November 2, 2020, ACE advised Princeton that ACE had retained coverage counsel. (*Id.*) Princeton posited in response to ACE in correspondence dated December 1, 2020 that "there was coverage under the . . . Policy . . . and that neither [ACE] nor . . . TRC had objected to the scope and cost estimate contained in [the Revised WCI Proposal]." (*Id.*)

ACE denied coverage to Princeton for the claim under the Policy in correspondence dated December 17, 2020 ("Denial"), which was eighteen months after ACE issued its Reservation Letter in 2019. (*Id.*; *see* Denial, ECF No. 8-8 (submitted by ACE); ECF No. 10-2 (submitted by Princeton at *180).) ACE acknowledged that the claim could have been covered under the Policy's pollution-conditions coverage due to a loss arising from remediation costs, as set forth in Sections I(A), V(DD), and V(NN). (Compl. 6; *see* Denial 1; *see also* Policy 1, 8, 10.) ACE nonetheless advised Princeton:

> [T]he Policy's Non-Owned Disposal Sites exclusion bars coverage for Princeton's Claim in its entirety. (Section VI(N)). The Policy's Asbestos exclusion further bars coverage for any remediation costs related to asbestos [at Section VI(A)]. Additional Policy exclusions may also bar coverage for Princeton's Claim, and [ACE] reserves all of its rights to assert any and all additional Policy exclusions.

(Denial 1; *see* Compl. 6; Policy 11, 13.) This was the first time that ACE raised the Asbestos Exclusion in its communications with Princeton. The Denial also posited:

> In Princeton's response and appeal to the [Administrative Order], Princeton likewise admitted that the alleged illegal dumping was facilitated or "undertaken by lower-level employees" of Princeton. Other evidence sources have similarly identified Princeton employees as facilitating or playing a role in the alleged illegal dumping. Under the . . . Policy, Princeton's employees constitute an "insured." (Endorsement 3 at Section V(AA)).

13

The Policy's Non-Owned Disposal Sites exclusion applies to "'loss' arising out of or related to 'pollution conditions' on, at, under or migrating from any treatment, storage, disposal, transfer or recycling site or facility that is not a 'non-owned disposal site.'" (Section VI(N)). The Policy defines a "non-owned disposal site," in relevant part, as a qualifying "treatment, storage, transfer, disposal or recycling site or facility . . . that has not at any time been owned or operated, in whole or in part, by any 'insured', which receives, or has historically received, . . . [Princeton's] waste for disposal." (Section V(JJ)). When read in conjunction with the Policy's Non-Owned Disposal Site Coverage (Insuring Agreement – Coverage C), the Non-Owned Disposal Sites exclusion unambiguously excludes coverage if a pollution condition arises from a treatment, storage, transfer, disposal, or recycling site or facility that Princeton itself owns or operates (as opposed to a site or facility that Princeton does not own).

Here, with respect to Princeton's Claim, it is undisputed that the location(s) or property at issue is [the Site]. Your own December 1, 2020 correspondence specifically notes the loss location as [the Site]. It is also undisputed that [the Site] is owned by Princeton, is named or referred to as "Princeton's Sewer Operating Committee" and/or the "Princeton Sewer Operating Plant" property, and that the foregoing property is also home to Princeton's "convenience center" . . . . It is further undisputed that the "pollution conditions" and illegal dumping alleged by Princeton occurred or arose at the [Site], which includes the location of Princeton's convenience center. As the below evidence examples will demonstrate, the [Site] and its accompanying convenience center constitutes a Princeton treatment, storage, transfer, disposal, or recycling site or facility that Princeton itself owns or operates (as opposed to a site or facility that Princeton does not own). Accordingly, Princeton's Claim falls squarely within the Policy's Non-Owned Disposal Sites exclusion and is consequently barred from coverage.

For example, in its July 2019 report, Princeton's environmental consultant, [WCI], noted that it had investigated the [Site] and found that Princeton "operates a municipally exempt site at the above-referenced address where township-owned vehicles are stored." [WCI's] July 2019 report also noted that "the site conducts some limited recycling and occasionally stages millings and dirt from township projects for reuse. Historically, the township has allowed contractors doing projects in the town to store their equipment at this location." Likewise, [WCI's] February 2020 investigative report explained that "Princeton operates a municipally exempt Site at the above-referenced address where township-owned Department of Public Works vehicles are maintained. In addition, the Site conducts

some limited recycling and stages millings, municipal waste in dumpsters and houses soil arising from township projects. Historically, the township has also allowed contractors performing projects in the town to store their equipment at this location." [WCI's] second report also multiple times referred to the [Site] as a "landfill."

Importantly, and as we noted above, the [Site] has also been characterized by Princeton itself as the home of Princeton's "convenience center." Specifically, in Princeton's August 2019 response and appeal to the [Administrative Order], Princeton stated that "[a]s soon as Princeton learned of the activities in question, it immediately blocked all access to the site . . . [and] closed down the convenience center." Outside investigations by several independent news organizations have similarly concluded that the [Site] housed Princeton's convenience center.

Moreover, we obtained an archived website page of the former, official Princeton Convenience Center website from 2018. The website page demonstrates that Princeton operated its Convenience Center at [the Site] where it instructed residents to drop off, among other things, "textiles, televisions, tires off the rim, vehicle oil, monitors/laptops/computers," "household construction debris," furniture, other appliances, and more. The website also advised residents to obtain and pay for "Disposal Permits" or "a special permit for disposal" with respect to certain materials residents wished to leave at the [Site], and that such permits could be obtained specifically from the "Princeton Sewer Operating Committee." In sum, and in accordance with the Policy's Non-Owned Disposal Sites exclusion, Princeton's own historical use of the [Site] and its accompanying convenience center as a treatment, storage, transfer, disposal, or recycling site or facility consequently bars coverage for the alleged pollution conditions at [the Site] that Princeton seeks coverage for.

With respect to the Policy's Asbestos exclusion, it excludes coverage for " '[l]oss' arising out of or related to asbestos or asbestos-containing materials." (Section VI(A)). While the exclusion contains three exceptions, none apply here. . . .

Here, numerous sources found asbestos in their investigations of the [Site]. Moreover, [WCI] not only found asbestos but also reported removing the asbestos from the [Site] and properly disposing of it off-site. This falls plainly within the Asbestos exclusion, and none of the exceptions to the exclusion apply here. . . .

. . . .

15

> With respect to the potential applicability of additional Policy exclusions, these exclusions include but are not limited to the Policy's exclusions for Fraud or Misrepresentation (Section VI(G)), Known Conditions (Section VI(K)), and Intentional Non-Compliance (Section VI(J)). As [ACE] considers further investigation of these additional exclusions, among any others, we request that Princeton supply [ACE] with information and documents concerning the identities, job descriptions, knowledge, and conduct of any of Princeton's employees and "responsible person[s]" (see Endorsement No. 3 at Section V(PP)) as may be relevant to Princeton's Claim. This request includes but is not limited to information and documents concerning . . . [(1)] the purported Manager of Operations and/or supervisor of Princeton's Sewer Operating Committee and/or Sewer Operating Plant, (2) . . . the purported director of the Department of Infrastructure and Operations for Princeton, and (3) any other relevant individuals. Please also explain the extent to which . . . [these] individuals may have been "responsible for environmental affairs, control, or compliance" at the [Site].

(Denial 2-4; *see* Compl. 6.)

In contrast to ACE's Denial, Princeton posits in the Complaint that "[t]he location on the Site where the illegal dumping/disposal of construction materials occurred . . . was at no time a location where either solid waste disposal or recycling activities were licensed to occur or had occurred with Princeton's authorization." (Compl. 7.) Princeton further alleges that "[a] small area located elsewhere on the Site was maintained by Princeton for use by its residents as a drop-off area for recyclable household items and was located a distance away from where the illegal dumping/disposal on the Site occurred." (*Id.*)

Princeton then authorized WCI to engage in the Clean Up Plan. As a result, Princeton has allegedly incurred costs in excess of $1 million for the remediation work. (*Id.*) Princeton asserted causes of action against ACE in state court on October 31, 2023 for breach of contract, a judgment declaring that ACE must provide coverage for the loss, breach of the covenant of good faith and fair dealing, and bad faith. (*See generally* Compl.) ACE removed the action pursuant to diversity

jurisdiction on November 30, 2023. (Notice of Removal, ECF No. 1.)[4] The parties agree that New Jersey law applies to this dispute. (*See* Def.'s Moving Br. 12-24, ECF No. 8-1; Pl.'s Opp'n Br. 16-24, ECF No. 10.)

## II.   LEGAL STANDARDS

### A.   Motions To Dismiss

The standard for resolving this Motion, *i.e.*, a motion that has been made pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss a claim, has been enunciated by the United States Supreme Court and the Third Circuit Court of Appeals. *See Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (setting forth the standard, and explaining the holdings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-12 (3d Cir. 2009) (setting forth the standard, and explaining the holdings in *Iqbal* and *Twombly*). A court must accept all of a plaintiff's factual allegations as true, construe a complaint in the light most favorable to the plaintiff, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint that is above a speculative level. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Fowler*, 578 F.3d at 211-12. A plaintiff need only raise factual allegations in response to a motion to dismiss that are enough to raise a right to relief that is above that speculative level. *See Kedra v. Schroeter*, 876 F.3d 424, 440-41 (3d Cir. 2017).

---

[4] Princeton is a municipality, and thus it is deemed to be a citizen of the state in which it is located, *i.e.*, New Jersey. *See Lasky v. Borough of Hightstown*, No. 09-01717, 2009 WL 1045018, at *1 n.1 (D.N.J. Apr. 20, 2009) (citing *City of Dawson v. Columbia Ave. Sav. Fund, Safe Deposit, Title, & Tr. Co.*, 197 U.S. 178, 180 (1905)); 28 U.S.C. § 1332(a)(1). ACE is incorporated and maintains its principal place of business in Pennsylvania, and thus it is deemed to be a citizen of only Pennsylvania. (Notice of Removal 2); *see* 28 U.S.C. § 1332(c)(1). Princeton alleges that it has incurred damages in excess of $1 million, and thus the matter in controversy exceeds the sum of $75,000 as required by 28 U.S.C. § 1332(a). (Compl. 7.)

**B.      Documents Not Attached To The Complaint**

It is without question that the Court may consider the contents of the Policy in addressing the Motion, as the Policy is attached to the Complaint in full. (*See* ECF No. 1-2.) But the Reservation Letter, the Denial, and the Administrative Order are not annexed to the Complaint, and documents outside of the pleadings ordinarily may not be considered without converting a motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

Documents that are not attached to a complaint, however, may be considered on a motion to dismiss if those documents are "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation, quotation marks, and alterations omitted) (permitting consideration of publicly-issued reports that were not attached to a complaint but were attached to a motion to dismiss); *see Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017) (permitting an entire essay to be considered on a motion to dismiss, although plaintiff cited only portions thereof in the complaint); *Dykes v. Se. Pa. Transp. Auth.*, 68 F.3d 1564, 1566 n.3 (3d Cir. 1995) (permitting consideration of a collective bargaining agreement that was cited in a complaint but not attached thereto). The Court should not be prevented from determining whether a claim is legally deficient where a plaintiff has failed to attach a dispositive, authentic document upon which the plaintiff relied to a complaint that is in turn provided by a moving defendant, since "the plaintiff obviously is on notice of the contents of the document." *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993) (addressing contract at issue that was not attached to the complaint but was attached by defendant to a motion to dismiss).

As the Reservation Letter and the Denial are referenced, quoted, and relied upon in the Complaint by Princeton itself, the Court is permitted to refer to their entire contents in addressing

the Motion to Dismiss. *See Borough of Moosic v. Darwin Nat'l Assurance Co.*, 556 F. App'x 92, 94-95 (3d Cir. 2014) (considering denial letter that was not attached to a complaint but submitted by defendant insurer on motion to dismiss in an insurance-coverage dispute, as denial letter was integral to or explicitly relied upon in the complaint); *S. Millville Props. LLC v. Westchester Surplus Lines Ins. Co.*, 698 F. Supp. 3d 766, 772 (D.N.J. 2023) (considering partial declination of coverage letter that was not attached to a complaint but submitted by defendant insurer on motion to dismiss, because plaintiff relied on, referenced, and quoted from the letter throughout the complaint); *Hinsinger v. Conifer Ins. Co.*, No. 20-14753, 2022 WL 17820259, at *1-3 (D.N.J. Dec. 20, 2022) (addressing reservation-of-rights letters submitted by defendant insurer on a motion to dismiss, as plaintiff referenced and relied on them in the complaint). For similar reasons, the Court may consider the Administrative Order in addressing the Motion to Dismiss as well. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (holding a court may consider orders that were not attached to a complaint in addressing a motion to dismiss, as orders are matters of public record); *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (same); *see also Behar v. Murphy*, No. 20-05206, 2020 WL 6375707, at *1 n.1 (D.N.J. Oct. 30, 2020) (finding a court could consider the Governor's executive orders and any related administrative orders).

The Court's conclusion is buttressed by the fact that Princeton discusses the case law concerning these types of documents in its opposition brief, but Princeton does not object to the consideration or inclusion of the specific documents. (Pl.'s Opp'n Br. 19.) Any objection that Princeton might have had to these documents being considered by the Court in addressing the Motion is thereby waived.

### III.   <u>DISCUSSION</u>

For the reasons outlined below, the Motion is: (1) granted to the extent that the Motion seeks dismissal of the breach of the covenant of good faith and fair dealing claim and the bad faith claim; and (2) denied to the extent that the Motion seeks dismissal of the claim for breach of contract and for a judgment declaring that ACE must provide coverage for Princeton's loss.

### A.   **Claim for Breach of Covenant of Good Faith and Fair Dealing, and Bad Faith Claim**

Princeton asserts a claim for the breach of the covenant of good faith and fair dealing and a bad faith claim against ACE. (Compl. 9-11.) ACE argues for the dismissal of those two claims, *inter alia*, for being duplicative of Princeton's breach of contract claim. (Def.'s Moving Br. 18-20.) Princeton's factual allegations concerning ACE's conduct underlying the claim for breach of the covenant of good faith and fair dealing and the bad faith claim are the same factual allegations underlying the claim for breach of contract. (Compl. 2 (section entitled "Facts Relevant To All Claims"); *see id.* at 1-7 (factual allegations underlying all causes of action).)

When a claim for a breach of the covenant of good faith and fair dealing and a bad faith claim are both brought simultaneously with a claim for breach of contract in the context of an insurance-coverage dispute between an insured and its insurer, the aforementioned claims are deemed to be duplicative of the breach of contract claim. *See Hobson v. Hartford Ins. Co. of the Midwest*, No. 21-20696, 2022 WL 4536470, at *6 (D.N.J. Sept. 28, 2022) (dismissing a claim for breach of the covenant of good faith and fair dealing and a bad faith claim in an insurance coverage dispute wherein a breach of contract claim had been asserted); *Petri v. Drive N.J. Ins. Co.*, No. 21-20510, 2022 WL 4483437, at *6 (D.N.J. Sept. 26, 2022) (holding same); *Veyhl v. State Farm Fire & Cas. Co.*, No. 21-10112, 2021 WL 6062304, at *3 (D.N.J. Dec. 22, 2021) (same); *see also Hahn v. OnBoard LLC*, No. 09-03639, 2009 WL 4508580, at *6 (D.N.J. Nov. 16, 2009) (holding

20

that a plaintiff may not maintain a separate claim for breach of the covenant of good faith and fair dealing because it would be duplicative of the already-pleaded breach of contract claim).

The Motion is granted to the extent that it seeks dismissal of the breach of the covenant of good faith and fair dealing claim and the bad faith claim. Those claims must be dismissed at the motion-to-dismiss stage for being duplicative of the breach of contract claim herein. *See Veyhl*, 2021 WL 6062304, at *3 (holding same). As the Court is dismissing those two claims for being duplicative, the other grounds for dismissal raised by ACE will not be addressed.

The Court notes that the declaratory-judgment claim could be dismissible at this juncture, as that claim could also be construed as being duplicative of the breach of contract claim. *See Petri*, 2022 WL 4483437, at *7 (holding a claim for declaratory relief "would be duplicative" of a breach of contract claim in an insurance-coverage dispute); *Hobson*, 2022 WL 4536470, at *6 (holding a declaratory-judgment claim is not "a standalone claim," and plaintiff "may seek a declaratory judgment as a remedy in connection with [a breach of contract claim]" in a case concerning an insurance-coverage dispute). ACE, however, has not sought to dismiss the declaratory-judgment claim on that ground, and the Court is not inclined to dismiss that claim *sua sponte*.

## B.      Breach of Contract Claim

ACE asserted the Asbestos Exclusion, the Fraud or Misrepresentation Exclusion, the Known Conditions Exclusion, and the Intentional Non-Compliance Exclusion in the Denial. (*See* Denial 1-4.) But the Court's review of the papers submitted in support of and in opposition to the Motion reveals that ACE does not substantively argue for the application of the aforementioned Exclusions and that Princeton does not address them at all. (*Compare, e.g., id.* 1, 3, 4 (raising Asbestos Exclusion) *with* Def.'s Moving Br. 9 (mentioning that the Denial noted the Asbestos Exclusion without any further analysis); *see also* Def.'s Reply Br., ECF No. 11 (failing to raise

any of the four aforementioned Exclusions).) The Court will not address those four Exclusions as a result.

ACE does argue that the Non-Owned Disposal Sites Exclusion mandates a finding of no coverage for Princeton's claim. (Def.'s Moving Br. 1, 11-16; *see* Policy 13.) This assertion is consistent with ACE's previous reasons for declining coverage that are set forth in the Denial. (*See* Denial 1 (stating "the Policy's Non-Owned Disposal Sites exclusion bars coverage for Princeton's Claim in its entirety").) As to that Exclusion, ACE asserts that coverage is barred because Princeton owned the property at issue and because the dumping was illegal in nature, and there would only be coverage if the pollution condition were on, at, under, or migrating from any site that is a Non-Owned Disposal Site. (Def.'s Moving Br. 12-15.) A Non-Owned Disposal Site is defined in the Policy as a legal treatment, storage, transfer, disposal, or recycling site or facility that has not at any time been owned or operated, in whole or in part, by Princeton, and is also properly licensed to operate to accept Princeton's waste by federal or state government agencies. (*Id.* at 11, 12 (discussing the Policy's Section VI at paragraph N concerning loss, and Section V at paragraph JJ(1)(a) concerning Non-Owned Disposal Sites).)

In addition to the Non-Owned Disposal Sites Exclusion, ACE also asserts for the first time in its briefing filed in support of the Motion that the Landfills or Recycling Facilities Exclusion bars coverage, which is an assertion that is completely absent from the Denial. (Def.'s Moving Br. at 1, 16, 17; *cf.* Denial.)

    *1.*    *Non-Owned Disposal Sites Exclusion*

The Court will not dismiss the breach of contract claim based on ACE's assertion of the Non-Owned Disposal Sites Exclusion, because Princeton has demonstrated that the breach of contract claim is plausible. As an initial matter, ACE's interpretation of the Non-Owned Disposal

Sites Exclusion seems to conflict with the Illicit Abandonment Provisions of the Policy found at Section V under Paragraph Y and Paragraph LL(1), which appear to indicate that the Policy views an illicit abandonment as a covered "pollution condition." (*See* Policy 7, 9.) To the extent that coverage is not provided if the abandonment is carried out by an insured or someone affiliated with an insured, it is unclear at this juncture exactly who committed the illegal disposal on the portion of the Site at issue. There is a mention in the record that at least one Princeton employee may have been acting outside of his authority in permitting illegal disposals, which could operate to remove that employee from the definition of being deemed to be an "insured" under the policy. (*See id.* at 8 (defining an "insured" as including an employee who is "acting within the scope of his or her duties as such" at Section V at Paragraph AA).) Princeton similarly points out that:

> Notably, the Policy limits the definition of "insured", with respect to employees, as those who are "acting within the scope of his or her duties as such" and limits coverage for "illicit abandonment" to activities by persons who are not an insured. Any Princeton employee at the [Site] who affirmatively allowed or abetted the improper disposal of materials there was not acting within the scope of their duties. Thus, such disposal at the [Site] clearly constitutes as "illicit abandonment" under the Policy.

(Pl.'s Opp'n Br. 16 n.2.) The issue is not completely fleshed out yet, but Princeton's resultant argument in favor of a finding of coverage by Princeton goes beyond mere speculation.

Princeton also plausibly argues at this juncture that: (1) the Site is comprised of over fifty-five acres, and that a recycling center was used for residential items alone and was operated at least 500 feet away from the location of the illegal dumping on the Site; and (2) the two portions of the Site were completely separate as a result. (*Id.* at 19, 20; *see* Beaupre Decl. 1, ECF No. 10-3 (stating the Site "totals more than 55 acres in area"); Aerial Photograph of Site, ECF No. 10-3 (indicating the recycling center was separate from the illegal dumping area).) Notwithstanding

23

ACE's reply that the Site should be treated as one contiguous parcel (*see* Def.'s Reply Br. 5), the Court finds that discovery is necessary on this issue.

ACE's reliance on three cases in support of dismissal based on the Non-Owned Disposal Sites Exclusion is misplaced. (Def.'s Moving Br. 14, 15.) ACE cites *Hatco Corp. v. W.R. Grace & Co.-Conn.*, 801 F. Supp. 1334 (D.N.J. 1992), which held that an insurance policy could effectively exclude coverage for pollution claims arising on the insured's own property. *Id.* at 1360-61. That holding, however, was issued at the summary-judgment stage for the proceedings, whereas this case remains at the motion-to-dismiss stage. *See id.* at 1359. In addition, the District Court in that case declined to grant any dispositive relief at that juncture, because "the inadequate record presented in support of this motion, together with the fact sensitive nature of the issue involved, makes inappropriate any blanket declaration of the parties' rights under the exclusion," and thus "it is far from clear whether any of the damage at the . . . site is excluded by the owned-property exclusion." *Id.* at 1361. Those words are prescient here, as a resolution of the instant dispute is fact sensitive and the record is not adequately developed.

ACE also relies on *F.L. Smidth & Co. v. Travelers Insurance Co.*, 679 A.2d 170 (N.J. App. Div. 1996), which excluded coverage in certain circumstances for claims arising on property owned or occupied by the insured. *Id.* at 173-74. The analysis in that case is factually inapposite, however, as that case concerned contaminated groundwater whereas the instant case concerns contaminated soil. *Id.* at 174. It also appears that an evidentiary proceeding was conducted before the trial court issued a ruling upon which the appellate court engaged in a review, whereas the case before this Court remains in the motion-to-dismiss stage. *Id.* at 171 (noting the "trial judge . . . concluded that there was no evidence that the contaminated groundwater migrated off-site"). The holding in *Kimber Petroleum Corp. v. Travelers Indemnity Co.*, 689 A.2d 747 (N.J. App. Div.

1997), upon which ACE also relies, is also inapposite because there was no discussion therein of any policy provision concerning illicit disposal, which is at issue and momentarily central in the instant case.

The eighteen months that elapsed between the filing of Princeton's claim and the issuance of ACE's Denial is also troubling. Princeton argues that it was prejudiced by ACE's delay, as Princeton: (1) went through the effort and expense of responding to ACE's queries and altering its remediation plans at ACE's behest; (2) expended municipal funds on other projects rather than on remediation efforts because ACE indicated through its conduct that it would be covering the loss; (3) waited longer than it would have hoped to remediate the pollution; and (4) failed to comply with the NJDEP's directives in a timely manner because it awaited ACE's review of any remediation plan at ACE's direction. (Pl.'s Opp'n Br. 2, 18, 19, 21.) This delay could operate to estop ACE from asserting the Non-Owned Disposal Sites Exclusion, as an insurer's unreasonable delay in disclaiming coverage can estop that insurer from later denying coverage under a policy. *See Griggs v. Bertram*, 443 A.2d 163, 168-69 (N.J. 1982) (noting that if "conduct by an insurer can be said to constitute a material encroachment upon the rights of an insured to protect itself by handling the claim directly and independently of the insurer, then prejudice to those rights should be presumed"). A delay of eighteen months between an insured's filing of a claim and an insurer's ultimate denial of coverage — which is the time of the delay in this case — has been found to be potentially prejudicial to an insured to the point of estopping the insurer from disclaiming coverage. *See id.* at 170 (noting that an insurer's conduct over the course of eighteen months without indicating that coverage was at risk can lead "the insured [to be] justified in believing the insurer is vigorously exercising these rights in a manner which will fully protect the insured's interest under the policy").

25

It is plausible at this early stage in the litigation that Princeton could be shown to have been lulled into complacency to the point of prejudice in expecting coverage, and that ACE may indeed be estopped from denying coverage. The Court will allow the breach of contract claim and the related declaratory-judgment claim to proceed for this additional reason as well. *See Hinsinger*, 2022 WL 17820259, at *6 (denying motion to dismiss on estoppel grounds, because the insurer's delay in addressing the insured's claim was so extensive that the insured's assertion of severe prejudice was plausible); *see also Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 446-47 (3d Cir. 2003) (finding an insurer was estopped from denying coverage due to its eighteen-month delay from when the insured initially sought coverage under the policy).

The cases cited by ACE to argue that estoppel does not apply in this case are inapposite. (Def.'s Reply Br. 9.) ACE relies on *Wyndham Construction, LLC v. Columbia Casualty Insurance Co.*, 208 F. Supp. 3d 599 (D.N.J. 2016), which granted the defendant insurer's motion for judgment on the pleadings and rejected the plaintiff insured's argument that the insurer was estopped from disclaiming coverage. *Id.* at 607. The delay in that case, however, was merely one month in duration. *Id.* at 606 (noting the insured filed a claim with the insurer in February 2015 and the insurer issued the denial in March 2015). It is not necessarily plausible that a one-month delay by an insurer lulled an insured into complacency to the point of prejudice, whereas such an argument is plausible when the delay at issue is eighteen months in duration.

ACE's reliance on *Federal Insurance Co. v. Cherokee Ardell, L.L.C.*, No. 08-02581, 2011 WL 1254036 (D.N.J. Mar. 28, 2011), is similarly misplaced. In that case, an insurer's ten-month delay in issuing a decision on insurance coverage was found to not merit the application of estoppel against the insurer. *Id.* at *18, *19 (noting the insurer issued a reservation-of-rights notice in December 2006 and then issued a denial of coverage in October 2007). That case is distinguishable

from the instant case, as the holding was issued at the summary-judgment stage, whereas the instant case remains in the motion-to-dismiss stage of this litigation. *See id.* at \*19. In addition, the environmental remediation project at issue in that case had been ongoing for many years and involved several different insurers when the claim was initially filed, whereas the instant case is a discrete claim that arose immediately before ACE was notified. *See id.* at \*3.[5]

### 2.     *Landfills or Recycling Facilities Exclusion*

The Court will not dismiss the breach of contract claim based on ACE's assertion of the Landfills or Recycling Facilities Exclusion. Princeton initially raises a plausible argument that the recycling functions were separate and apart from the portion of the Site whereupon the illegal dumping was occurring, and thus discovery is needed to clarify whether the recycling functions were indeed completely separate on the fifty-five-acre Site. (Pl.'s Opp'n Br. 14, 15.)

The delay of more than four years between Princeton filing a claim in 2019 and ACE's first assertion of the Landfill or Recycling Facilities Exclusion as part of its Motion in 2023, when viewed in conjunction with ACE's silence as to that Exclusion in the Reservation Letter and in the Denial, also raises the plausible argument that ACE may be estopped from raising that Exclusion. The case law and legal discussion concerning estoppel as applied to the Non-Owned Disposal Sites Exclusion is equally appropriate here. It is also unclear how the Landfill or Recycling Facilities Exclusion affects the coverage for a pollution condition caused by illicit abandonment, as similarly discussed above concerning the Non-Owned Disposal Sites Exclusion. Further discovery is needed on that issue.

---

[5] ACE also relies on a part of the holding in the *Hatco Corporation* case that addresses the issue of estoppel. *See* 801 F. Supp. at 1362-63. As noted herein previously, that holding was issued at the summary-judgment stage, whereas this case has not extended beyond the motion-to-dismiss stage. That holding is not relevant here.

IV.     **CONCLUSION**

For the reasons outlined above, ACE's Motion is granted in part and denied in part as follows: (1) granted to the extent that the Motion concerns (a) the breach of the covenant of good faith and fair dealing claim, and (b) the bad faith claim; and (2) denied to the extent that the Motion concerns (a) the claim for breach of contract, and (b) the claim for a judgment declaring that ACE must provide coverage for the loss to Princeton.[6]

_____
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

---

[6] The Court notes that any discovery should not necessarily be limited to the discussion herein concerning Princeton's plausible arguments buttressing its claims, as other potential inconsistencies in the Policy or in ACE's handling of Princeton's request for coverage may come to light as the litigation proceeds.